## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NO.:

MIGUEL QUINTERO,

     Plaintiff,

v.

MIAMI-DADE COUNTY, FLORIDA, a
political subdivision of the State of Florida,
JAMES BYERS, FRANKIE RODRIGUEZ,
ANDRES BORGES, VINCENT CARR,
NICOLE LOPEZ, and SUSY TRUDY, all in
their individual capacities as residents of
the State of Florida.

     Defendants.           /

## COMPLAINT

Plaintiff, MIGUEL QUINTERO ("Mr. Quintero"), brings this Complaint against Miami-Dade County, Florida ("the County") and its employees James Byers, Frankie Rodriguez, Andres Borges, Vincent Carr, Nicole Lopez, and Susy Trudy and alleges the following:

## THE PARTIES, JURISDICTION, AND VENUE

At all times material to this action:

1.     Mr. Quintero was a citizen of the State of Florida, and a resident of Miami-Dade County, Florida.

2.     Defendant, Miami-Dade County, was a public entity incorporated under the laws of the State of Florida, and is responsible for establishing, organizing, operating, enacting, and enforcing the code and laws within Miami-Dade County, Florida.

3.      Defendant, James Byers, was a resident of the State of Florida and employed by the County as the Chief Zoning Officer.

4.      Defendant, Frankie Rodriguez, was a resident of the State of Florida and employed by the County as a Code Enforcement Compliance Officer.

5.      Defendant, Andres Borges, was a resident of the State of Florida and employed by the County as a Code Enforcement Officer.

6.      Defendant, Vincent Carr, was a resident of the State of Florida and employed by the County as a Code Enforcement Officer.

7.      Defendant, Nicole Lopez, was a resident of the State of Florida and employed by the County as a Code Enforcement Officer.

8.      Defendant, Susy Trudy, was a resident of the State of Florida and employed by the County as the Deputy Supervisor or Elections.

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.  Mr. Quintero also requests that this Court exercise supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a) because they arise out of the same operative nucleus set of facts.  Venue is proper because the events giving rise to the claims all occurred within Miami-Dade County, Florida.

## FACTS GIVING RISE TO THE CLAIMS

10.      In June of 2020, Miguel Quintero purchased a beautiful home in the northern portion of unincorporated Miami-Dade County, which is on an acre lot and sits next to a lake.

11.      He is a flying trapeze artist who loves the art.[1]

---

[1] Relevant below, Mr. Quintero is also an independent journalist who has over 3,500 subscribers on his YouTube Channel.

12.     Shortly after Mr. Quintero purchased the property, he built a trapeze set to practice his skills.

13.     Mr. Quintero believes that his trapeze set is the equivalent of a swing set under the Miami-Dade Code of Ordinances (the "Code"), since no part of it is permanently attached to the ground.

14.     Over time, Mr. Quintero began teaching other people how to use the trapeze.

15.     In September of 2021, the County issued Mr. Quintero a "courtesy warning" for running a business, *i.e.* Miami Flying Trapeze, from his home without obtaining a certificate of use.

16.     Over the next several months, Mr. Quintero spoke to several individuals within Miami-Dade County's Regulatory and Economic Resources Division[2] ("RER") about his trapeze set.

17.     During these conversations, James Byers, the Chief of RER's Zoning Division, told Mr. Quintero that he could utilize his trapeze set for his personal use, but could not use it for his home-based business without a certificate of use.

18.     Eventually, Mr. Byers addressed Mr. Quintero's courtesy warning and denied Mr. Quintero's request to maintain his trapeze business in his backyard.

19.     Mr. Quintero did not agree with Mr. Byers' assessment of the Code and asked for a consortium of high-ranking County officials to address the issue.

20.     In December of 2021, Mr. Quintero met with Pedro Estopinan – Chief of Building Enforcement; Beverly Washington – Chief of Neighborhood Compliance; James Byers – Chief

---

[2] RER has several divisions, including building, zoning, and code enforcement, *inter alia*.

of Zoning; Andrea Darrough – Code Enforcement Compliance Supervisor; and several other County officials.

21.     During the meeting, County officials requested that Mr. Quintero remove the advertising of Miami Flying Trapeze from the internet and cease operation until Mr. Byers had an opportunity to speak with senior management.

22.     In exchange for removing his business advertisement, the County agreed to close Mr. Quintero's case.

23.     On September 2, 2022, Miami-Dade County issued Mr. Quintero a letter addressing several alleged building and code violations on his property.

24.     The County claimed in the letter that: (i) Mr. Quintero's tree house had been built without the requisite permits; (ii) his plans for a Tiki Hut were improper; (iii) his utility shed needed a building permit; (iv) his vacation rental application was denied because of outstanding code violations; (v) his trapeze set required a building permit; (vi) his home had an illegal addition; and (vii) his solar roof permit expired.

25.     Mr. Quintero was stunned when he received the September 2, 2022, letter because many of the alleged violations listed therein were unfounded or inaccurate.

26.     Equally important, Mr. Quintero was particularly shocked to learn that the County had conducted an "electrical inspection" of his home that was "performed virtually."

27.     Based on photographs of Mr. Quintero's home that were posted on RER's website, which were clearly taken from the sky, Mr. Quintero believed that the County had used drone surveillance to conduct its "electrical inspection."

28.     Mr. Quintero knew that Florida Statute 934.50 specifically prohibits warrantless surveillance of private property by the government.

29.     After discovering that RER used drones to surveillance his property, Mr. Quintero also learned that RER routinely uses drone surveillance on private property.[3]

30.     On September 8, 2022, Mr. Quintero exercised his First Amendment right to protest against the County's drone surveillance program and the conclusions in its September 2, 2022, letter.

31.     Mr. Quintero, who is also an independent journalist with over 3,500 YouTube subscribers, live-streamed his protest via YouTube to express his grievances and to expose the County's illegal actions.

32.     On September 9, 2022, Mr. Quintero entered RER Headquarters to request records of his home and business.

33.     However, the County provided him with incomplete records, which appeared to be intentionally withheld or falsified.

34.     Mr. Quintero began questioning the transparency and integrity of the County's actions and record-keeping practices.

35.     Based on the County's conduct, Mr. Quintero protested outside of RER Headquarters every day from September 8, 2022, through September 12, 2022.

36.     Mr. Quintero only discontinued his daily protests at RER because of personal commitments.

37.     Nevertheless, Mr. Quintero planned to address his concerns at the next County Commission meeting, which was scheduled for September 20, 2022.

---

[3] Mr. Quintero reviewed several other RER cases online and noticed that the County had a widespread practice of using drone surveillance on private property.

38.     On that day, Mr. Quintero attempted to inform the Mayor and County Commission about the County's aerial surveillance practice and RER's unjust treatment of him.

39.     After Mr. Quintero spoke at the Commission meeting, the Commissioner of his district approached Mr. Quintero.

40.     Mr. Quintero explained his concerns to his Commissioner.

41.     The Commissioner seemed to be concerned and took Mr. Quintero's information.

42.     Nevertheless, the Commissioner never contacted Mr. Quintero.

43.     On September 23, 2022, three days following Mr. Quintero's public address at the Commission meeting, he received four "courtesy warnings" for alleged violations on his property.

44.     Frankie Rodriguez, a Neighborhood Compliance Officer, who is not even assigned to Mr. Quintero's area,[4] issued the September 23, 2022, "courtesy warnings."

45.     The County hastily issued the warnings to silence Mr. Quintero's vocal criticism of RER.

46.     The most obvious retaliatory "courtesy warning" was for a trailer located on Mr. Quintero's property.

47.     The trailer warning was retaliatory because: (i) the trailer had never been mentioned before in any of the prior communications; (ii) no neighbor complained about it; (iii) it was the proper size for residential storage[5]; and (iv) the County never actually measured or inspected it.

---

[4] The code enforcement officer assigned to Mr. Quintero's area was Nazaret Jaspey.
[5] Mr. Quintero's trailer is 28 feet long and 9 feet high.  According to the Code, a homeowner is permitted to have a trailer up to 30 feet long and 10 feet high on residential property.

48.     The County wanted to penalize Mr. Quintero for exercising his constitutionally protected First Amendment right to free speech.[6]

49.     At a later hearing, Frankie Rodriguez, the Code Enforcement Officer who issued the four "courtesy warnings," even stated that he did not recall the circumstances surrounding the alleged violations.

50.     On September 26, 2022, following the courtesy warnings, Mr. Quintero drove to RER Headquarters to request additional public records from RER.

51.     Mr. Quintero equipped himself with a body-worn camera to document his interactions.

52.     When Mr. Quintero entered RER Headquarters, officials claimed that he was violating a county ordinance that prohibited filming in government buildings.

53.     RER officials directed their subordinates to refuse service to Mr. Quintero.

54.     RER officials then called the Miami-Dade Police Department to remove Mr. Quintero from the building.

55.     However, when law enforcement arrived, the police officers confirmed that Mr. Quintero had a constitutional right to film public officials in the exercise of their duties.

56.     RER officials were very upset and sought further retaliation against Mr. Quintero.

57.     As Mr. Quintero departed RER Headquarters on September 26, 2022, the higher-ups in the Code Enforcement Division dispatched Officer Andres Borges to Mr. Quintero's property for an "inspection."

---

[6] The County later attempted to retract the trailer citation, claiming that the citation was invalid because of a "change in ownership" of the home, which was completely untrue.

7

58.     Officer Borges issued Mr. Quintero another citation for his trailer, the same trailer targeted by Frankie Rodriguez, which the County knew was unjustified.

59.     Moreover, Officer Borges was outside of his normal working area and openly admitted that high-ranking RER officials directed him to issue the citation.

60.     The next day, September 27, 2022, Officer Borges returned to Mr. Quintero's home and issued him another citation for the trailer on his property.

61.     RER clearly engaged in a systematic campaign to retaliate against Mr. Quintero for exercising his constitutional rights.

62.     RER's action only caused Mr. Quintero to be more concerned about the way the County operates.

**Additional Retaliation and Illegal Searches of Mr. Quintero's Property.**

63.     On February 28, 2023, Code Enforcement Officer Vincent Carr unlawfully entered Mr. Quintero's gated property where no trespassing signs are posted.

64.     Officer Carr searched Mr. Quintero's curtilage without a warrant and without Mr. Quintero's permission.

65.     Officer Carr then began photographing areas of Mr. Quintero's home where he had no right to be.

66.     Despite this incident being captured on surveillance video, another County employee, Edgar Loiseau, falsely reported that no one was present when Mr. Carr conducted his search.

67.     To add insult to injury, when Mr. Quintero filed a public records request to retrieve the photographs taken by Officer Carr during his illegal search, Beatriz Gonzalez, a RER

employee, told him that Officer Carr <u>did not</u> take photographs of Mr. Quintero's property, which was a blatant lie.

68.     The County refused to provide Mr. Quintero with the photographs taken by Officer Carr until Mr. Quintero presented them with evidence from his surveillance system – showing that Officer Carr did in fact take photographs.

69.     On August 26, 2023, Code Enforcement Officer Nicole Lopez also disregarded the no trespassing signs on Mr. Quintero's property and conducted a warrantless search.

70.     Officer Lopez then illegally photographed Mr. Quintero's property, which the County published on its website.

71.     Mr. Quintero did not consent to the search or photographing of his property.

72.     However, Officer Lopez openly justified her actions by claiming she was permitted to enter the curtilage of private property pursuant to the County's policy.

73.     Ms. Lopez also stated that the County trained her to take pictures on private property, even without a warrant or consent.

74.     The County's policymakers have endorsed such actions, and even stated in a public hearing that code enforcement officers are authorized to enter and photograph private property without a warrant or permission from the owner.

75.     The County's policy, coupled with the training provided to code enforcement officers, constitutes a flagrant violation of Mr. Quintero's constitutional rights.

**Violations of Mr. Quintero's Right to Film in Public.**

76.     On October 24, 2022, at an early voting site located at 5400 NW 22nd Avenue, Mr. Quintero sought to document the importance of early voting in Miami.

77.     Instead of welcoming Mr. Quintero's right to record in public, County officials told Mr. Quintero that he needed special permission to film inside a government building, just as RER officials told him earlier.

78.     It is important to note that Mr. Quintero was not inside an area restricted for voting.

79.     Mr. Quintero was filming in an area where members of the public had a right to stand.

80.     Nevertheless, officials from the County's election department told Mr. Quintero that he needed a "press pass" to film.

81.     Mr. Quintero, who is an independent journalist, knew that members of the media have no greater right than any other citizen to record in public.

82.     Mr. Quintero informed the employees of his right to film, and he attempted to continue filming.

83.     However, election officials literally stood in front of Mr. Quintero and demanded that he leave the building or he would be forcefully removed.

84.     Based on this threat, Mr. Quintero departed.

85.     On October 26, 2022, at an early voting site located at 11380 NW 27th Avenue, Mr. Quintero sought again to document the importance of early voting.

86.     And again, an election official precluded Mr. Quintero from filming.

87.     This time, Mr. Quintero spoke to Susy Trudy, Deputy Supervisor of Elections, over the phone.

88.     Ms. Trudy told Mr. Quintero that he could film from outside of the doorway, but *only if he was a member of the media*.

89.     Mr. Quintero explained to Ms. Trudy what he tried to explain to her subordinates just days before, *i.e.* the Constitution does not differentiate between a citizen's right to film and the media's right to film.

90.     He also explained to Ms. Trudy that he was an independent journalist, that he had a background in journalism, and that he publishes topics of public interest on his social media platform.

91.     Nevertheless, Susy Trudy directed her subordinates to preclude Mr. Quintero from filming.

92.     On September 28, 2023, Mr. Quintero attempted to film a County Commission meeting in an area designated for the media.

93.     The area is the only place where citizens can record Commission meetings without disturbing anyone sitting behind them.

94.     While filming the Commission meeting, a police officer approached Mr. Quintero and told him that the area was reserved for traditional news organizations.

95.     Despite Mr. Quintero's explanation that he is an independent journalist, that he has a background in journalism, and that he planned to broadcast the meeting on YouTube, the officer still threatened to physically remove him.

96.     Mr. Quintero, in fear for his safety, vacated the area designated for traditional media.

**Additional Evidence of Retaliation.**

97.     When Mr. Quintero first purchased his home in June of 2020, he contracted with Tesla to install a solar panel roof.

11

98.     Since Mr. Quintero moved for the roof permit before he started protesting, the County quickly granted his request to install the roof.

99.     Unfortunately, Tesla delayed the project for years without explanation.

100.    When Mr. Quintero sought to extend the permit in February 2023, the County refused, citing the pending code enforcement citations issued to Mr. Quintero in September 2022 – the same citations that Mr. Quintero was actively contesting.

101.    The County's decision to withhold the permit extensions represented a clear act of retaliation against Mr. Quintero for exercising his right to free speech.

102.    In fact, a County official told Mr. Quintero that, when a citation is contested, all holds on the property are typically released, and all permits can be issued.

103.    But since Mr. Quintero protested against the County, it treated Mr. Quintero much differently than other property owners.

104.    The County specifically cited the "related holds" as a reason for denying Mr. Quintero the roof permit extension.

105.    The County repeatedly denied Mr. Quintero permits, including one to post his listing on AirBNB, which affected his ability to generate income.

106.    The County also denied, without reason, Mr. Quintero a permit to hire off-duty officers from the Miami-Dade Police Department ("MDPD") for traffic control during his political campaign fundraisers, even though MDPD had approved his application just days earlier.

107.    The County's actions violated Mr. Quintero's civil rights and clearly demonstrates a pattern of targeted harassment designed to suppress his constitutionally protected First Amendment rights.

108.    As a result, Mr. Quintero suffered economic and non-economic damages, including, but not limited to, lost wages, loss of privacy, pain and suffering, emotional distress, attorney's fees, and mental anguish, amongst other damages.

## COUNT I: FOURTH AMENDMENT VIOLATION –
## UNLAWFUL SEARCH USING DRONE SURVEILLANCE – MIAMI-DADE COUNTY

109.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

110.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

111.    The County violated Mr. Quintero's Fourth Amendment right against illegal searches when its officials conducted unlawful drone surveillance of his property without a warrant or consent.

112.    The officials were acting under color of law when they conducted the surveillance.

113.    The County had a custom, a policy, or a practice of allowing RER officials to use drones to conduct searches on residential property without consent or a warrant.

114.    The County caused injury to Mr. Quintero.

115.    The County's custom, policy, or practice was the moving force behind Mr. Quintero's injuries.

## COUNT II: FOURTH AMENDMENT VIOLATION –
## UNLAWFUL FILMING USING DRONES – MIAMI-DADE COUNTY

116.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

117.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

118.    RER officials violated Mr. Quintero's Fourth Amendment right to privacy when they filmed his property via drone surveillance without a warrant or consent.

119.    RER Officials were acting under color of law when they committed such acts.

120.    The County had a custom, a policy, or a practice of allowing RER officials to photograph residential property using drone surveillance without a warrant or consent.

121.    The County caused injury to Mr. Quintero.

122.    The County's custom, policy, or practice was the moving force behind Mr. Quintero's injuries.

### COUNT III: FOURTH AMENDMENT VIOLATION –
### UNLAWFUL SEARCH OF PRIVATE PROPERTY – MIAMI-DADE COUNTY

123.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

124.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

125.    Officers Carr and Lopez violated Mr. Quintero's Fourth Amendment right against illegal searches when they entered and searched the curtilage of Mr. Quintero's property without a warrant or consent.

126.    Officers Carr and Lopez were acting under color of law as code enforcement officers when they committed such acts.

127.    The County had a custom, a policy, or a practice of allowing code enforcement officers to conduct searches on residential property without consent or a warrant.

128.    Officer Lopez even stated that she was acting pursuant to the County's policy when she searched Mr. Quintero's property without a warrant or his consent.

129.    The County caused injury to Mr. Quintero.

130.    The County's custom, policy, or practice was the moving force behind Mr. Quintero's injuries.

### COUNT IV: FOURTH AMENDMENT VIOLATION – UNLAWFUL FILMING OF PROPERTY – MIAMI-DADE COUNTY

131.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

132.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

133.    Officers Carr and Lopez violated Mr. Quintero's Fourth Amendment right to privacy when they photographed and published pictures of Mr. Quintero's property from an area where they had no legal right to be.

134.    Officers Carr and Lopez were acting under color of law as code enforcement officers when they committed such acts.

135.    The County had a custom, a policy, or a practice of allowing code enforcement officers to photograph residential property without consent or a warrant from area where they had no legal right to be.

136.    Officer Lopez even stated that she was acting pursuant to the County's policy and her training when she photographed Mr. Quintero's property without a warrant or his consent.

137.    The County caused injury to Mr. Quintero.

138.    The County's custom, policy, or practice was the moving force behind Mr. Quintero's injuries.

## COUNT V: FOURTH AMENDMENT VIOLATION
## FAILURE TO TRAIN OR SUPERVISE – MIAMI-DADE COUNTY

139.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this

Complaint.

140.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States

Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

141.    Officers Carr and Lopez violated Mr. Quintero's Fourth Amendment right to be

free from illegal searches.

142.    Officers Carr and Lopez were not adequately trained in the area of regulatory

searches of private property by government officials.

143.    The County's policymakers knew or should have know that, based on at least one

earlier instance of unconstitutional conduct materially similar to Officers Carr and Lopez's

violation of Mr. Quintero's constitutional rights, that additional training/supervision was needed

to avoid illegal searches on private residences from recurring in the future.

144.    The County made a deliberate choice not to provide additional

training/supervision to Officers Carr and Lopez.

## COUNT VI: FOURTH AMENDMENT VIOLATION –
## UNLAWFUL SEARCH/ENTRY ONTO PROPERTY – VINCENT CARR

145.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this

Complaint.

146.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States

Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code Enforcement

Officer Vincent Carr.

16

147.     Officer Carr illegally entered and searched inside of Mr. Quintero's home without a warrant, probable cause, or exigent circumstances.

148.     In conducting the search, Officer Carr acted intentionally.

149.     Officer Carr's search inside the curtilage of Mr. Quintero's home was unreasonable under the circumstances.

150.     Officer Carr was acting under color of law as a code enforcement officer when he committed such acts.

### COUNT VII: FOURTH AMENDMENT VIOLATION – UNLAWFUL FILMING OF PROPERTY – VINCENT CARR

151.     Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

152.     Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code Enforcement Officer Vincent Carr.

153.     Officer Carr violated Mr. Quintero's Fourth Amendment right to privacy when he filmed and published photographs of Mr. Quintero's property from an area where he had no legal right to be.

154.     Officer Carr was acting under color of law as a code enforcement officer when he committed such acts.

155.     Officer Carr acted intentionally when he filmed Mr. Quintero's property.

156.     Officer Carr's filming inside the curtilage of Mr. Quintero's home was unreasonable under the circumstances.

157.     Officer Carr caused injury to Mr. Quintero.

## COUNT VIII: FOURTH AMENDMENT VIOLATION –
## UNLAWFUL SEARCH/ENTRY ONTO PROPERTY – NICOLE LOPEZ

158.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

159.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code Enforcement Officer Nicole Lopez.

160.    Officer Lopez illegally entered and searched the curtilage of Mr. Quintero's home without a warrant, probable cause, or exigent circumstances.

161.    In conducting the search, Officer Lopez acted intentionally.

162.    Officer Lopez's search inside the curtilage of Mr. Quintero's home was unreasonable under the circumstances.

163.    Officer Lopez was acting under color of law as a code enforcement officer when she committed such acts.

## COUNT IX: FOURTH AMENDMENT VIOLATION –
## UNLAWFUL FILMING OF PROPERTY – NICOLE LOPEZ

164.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

165.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code Enforcement Officer Nicole Lopez.

166.    Officer Lopez violated Mr. Quintero's Fourth Amendment right to privacy when she filmed and published photographs of Mr. Quintero's property from an area where she had no legal right to be.

167.    Officer Lopez was acting under color of law as a code enforcement officer when she committed such acts.

168.    Officer Lopez acted intentionally when she filmed Mr. Quintero's property.

169.    Officer Lopez's filming inside the curtilage of Mr. Quintero's home was unreasonable under the circumstances.

170.    Officer Lopez caused injury to Mr. Quintero.

## COUNT X:  FIRST AMENDMENT VIOLATION – RETALIATION BY JAMES BYERS

171.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

172.    This action is brought by Mr. Quintero pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade RER Zoning Chief James Byers.

173.    Mr. Quintero had a First Amendment right to protest government action and record government officials while they performed their duties.

174.    Mr. Byers retaliated against Mr. Quintero for exercising that right, *i.e.* by conspiring with other members within RER to issue Mr. Quintero bogus code enforcement citations and deny him building permits.

175.    Mr. Quintero's act of protesting against the government and recording government officials, which is protected by the First Amendment, was a motivating factor in Mr. Byer's decision to conspire with other employees to issue Mr. Quintero bogus citations and deny him building permits.

176.    Mr. Byer's decision to conspire with other RER employees to issue Mr. Quintero bogus citations and deny him building permits would likely deter a similarly situated reasonable

person from engaging in similar acts of recording RER officials or protesting against the government.

177.    Mr. Byers was acting under color of state law as a RER official and is therefore liable to Mr. Quintero pursuant to § 1983.

## COUNT XII:  FIRST AMENDMENT VIOLATION –
## RETALIATION BY FRAKIE RODRIGUEZ

178.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

179.    This action is brought by Mr. Quintero pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code Enforcement Officer Frankie Rodriguez.

180.    Mr. Quintero had a First Amendment right to record government officials while they performed their duties.

181.    Officer Rodriguez retaliated against Mr. Quintero for exercising that right, *i.e.* by issuing him bogus code enforcement warnings.

182.    Mr. Quintero's act of recording government officials, which is protected by the First Amendment, was a motivating factor in Officer Rodriguez's decision to conspire with other RER employees to issue Mr. Quintero bogus warnings.

183.    Officer Rodriguez's decision to conspire with other RER employees to issue Mr. Quintero bogus warnings would likely deter a similarly situated reasonable person from engaging in similar acts of recording RER officers.

184.    Officer Rodriguez was acting under color of state law and is therefore liable to Mr. Quintero pursuant to § 1983.

### COUNT XIII:  FIRST AMENDMENT VIOLATION –
### RETALIATION BY ANDRES BORGES

185.     Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this

Complaint.

186.     This action is brought by Mr. Quintero pursuant to title 42, section 1983, United

States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Code

Enforcement Officer Andres Borges.

187.     Mr. Quintero had a First Amendment right to protest government action and

record government officials while they performed their duties.

188.     Mr. Borges retaliated against Mr. Quintero for exercising that right, *i.e.* by

conspiring with other members within RER to issue Mr. Quintero bogus code enforcement

citations.

189.     Mr. Quintero's act of protesting against the government and recording

government officials, which is protected by the First Amendment, was a motivating factor in Mr.

Borges' decision to conspire with other employees to issue Mr. Quintero bogus citations.

190.     Mr. Borges' decision to conspire with other RER employees to issue Mr.

Quintero bogus citations would likely deter a similarly situated reasonable person from engaging

in similar acts of recording RER officers or protesting against the government.

191.     Mr. Borges was acting under color of state law as a code enforcement official

and is therefore liable to Mr. Quintero pursuant to § 1983.

### COUNT XIV: FIRST AMENDMENT VIOLATION
### INTERFERENCE WITH RIGHT TO RECORD – MIAMI-DADE COUNTY

192.     Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this

Complaint.

193.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

194.    The County violated Mr. Quintero's First Amendment rights when County officials prevented him from recording government officials who were engaged in the scope of their duties and/or precluding citizens from filming in places where the public has a right to be.

195.    The officials were acting under color of state law when they precluded Mr. Quintero from filming.

196.    The County had a custom, a policy, or a practice of precluding citizens from filming government officials while in the scope of their duties and/or precluding citizens from filming in places where the public has a right to be.

197.    The County caused injury to Mr. Quintero.

198.     The County's custom, policy, or practice was the moving force behind Mr. Quintero's injuries.

**COUNT XV: FIRST AMENDMENT VIOLATION**
**FAILURE TO TRAIN OR SUPERVISE – MIAMI-DADE COUNTY**

199.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

200.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County.

201.    Several RER, police, and election officials violated Mr. Quintero's First Amendment right to film government officials in the exercise of their duties and/or filming in public.

202.    The officials were not adequately trained in the area of the right to film government officials in the exercise of their duties and/or filming in public.

203.    The County's policymakers knew, or should have known, that based on at least one earlier instance of unconstitutional conduct materially similar, that additional training/supervision was needed to avoid First Amendment violations from likely recurring in the future.

204.    The County made a deliberate choice not to provide additional training/supervision to its officials.

### COUNT XVI – FIRST AMENDMENT VIOLATION
### FAILURE TO SUPERVISE – SUSY TRUDY

205.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

206.    Mr. Quintero brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of his Civil Rights caused by Miami-Dade County Deputy Supervisor of Elections Susy Trudy.

207.    Several subordinates of Susy Trudy violated Mr. Quintero's First Amendment right to record government officials in the exercise of their duties or filming in public.

208.    Susy Trudy personally participated and directed her subordinates to commit the violation of Mr. Quintero's First Amendment right to film in public or film government officials in their duties.

209.    Susy Trudy also directed her subordinate to take the action that resulted in the violation of Mr. Quintero's First Amendment right to record government officials or right to film in public.

210.    Susy Trudy's actions were intentional, and she was acting under color of law when she committed the violation.

### COUNT XVII: STATE LAW UNLAWFUL SEARCH OF PROPERTY – MIAMI-DADE COUNTY

211.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

212.     This action is brought by Mr. Quintero against Miami-Dade County, Florida for violating his right against illegal searches to his property under Article I, Section 12 of the Florida Constitution, and pursuant to Miami-Dade County's waiver of sovereign immunity under Florida Statute 768.28.

213.    Officers Carr and Lopez illegally entered and searched the curtilage of Mr. Quintero's property without a warrant, probable cause, or exigent circumstances.

214.    The officers' search of Mr. Quintero's home (curtilage) was unreasonable under the circumstances.

215.    The officers were acting under color of law as RER officers when they committed such acts.

216.    The officers were employed by Miami-Dade County, and therefore, the County is liable to Mr. Quintero for the damage caused by its officials.

### COUNT XVIII:  STATE LAW VIOLATION RETALIATION – MIAMI-DADE COUNTY

217.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

218.    This action is brought by Mr. Quintero against Miami-Dade County, Florida for violating his right to free speech under Article I, Section 4 of the Florida Constitution, and

pursuant to the Miami-Dade County's waiver of sovereign immunity under Florida Statute 768.28.

219.    Mr. Quintero had a right under the Florida Constitution to record government officials while they performed their duties and a right to film in public.

220.    The County, via its RER officers, retaliated against Mr. Quintero for exercising that right, *i.e.* by issuing him bogus code enforcement citation, kicking him out of buildings, denying him access to records, refusing to perform services, and refusing to issue permits that it would otherwise provide to citizens.

221.    Mr. Quintero's act of recording government officials or filming in public was a motivating factor in officials' decision to retaliate against him.

222.    The officials' action would likely deter a similarly situated reasonable person from engaging in similar acts of recording government officials or filming in public.

223.    The officers were employed by Miami-Dade County, Florida, and therefore, the County is liable to Mr. Quintero for the injuries caused by its officials.

### COUNT XIX - DECLARATORY RELIEF
### MIAMI-DADE COUNTY

224.    Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

225.    This action is brought by Mr. Quintero pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by Miami-Dade County, Florida.

226.    Miami-Dade County purports to give its RER Officers *carte blanche* authority to enter private property without a warrant or consent to conduct an inspection.

227.     Code Enforcement Officers Carr and Lopez unlawfully entered Mr. Quintero's property without a warrant or consent, which constituted a search forbidden by the Fourth Amendment.

228.     Officer Lopez bluntly told Mr. Quintero on camera that she has the absolute right to enter private property without a warrant, and that Miami-Dade County trains its employees to operate in such a manner.

229.     Accordingly, Mr. Quintero respectfully requests that this Honorable Court declare that Miami-Dade County's policy of allowing code enforcement officer to enter private property without a warrant or consent is unconstitutional and deprived Mr. Quintero and other similarly situated property owners of their Fourth Amendment right against illegal searches.

### COUNT XX - DECLARATORY RELIEF
### MIAMI-DADE COUNTY

230.     Mr. Quintero re-alleges the statements contained in paragraphs 1-108 of this Complaint.

231.     This action is brought by Mr. Quintero pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by Miami-Dade County, Florida.

232.     Miami-Dade County purports to require members of the public to obtain a "press pass" in order to film certain government operations.

233.     On October 24, 2022, and October 26, 2022, County employees precluded Mr. Quintero from filming certain public voting areas because he did not possess a "press pass."

234.     Additionally, on September 28, 2023, County employees precluded Mr. Quintero from filming the County Commission meeting because he did not possess a "press pass," even though he explained that he was filming for his YouTube Channel.

235.    Accordingly, Mr. Quintero respectfully requests that this Honorable Court declare that Miami-Dade County's policy of requiring members of the public to obtain a "press pass" in order to film in public areas is an unconstitutional restraint on a citizen's right to record the government.

## COUNT XXI – INJUNCTIVE RELIEF
## MIAMI-DADE COUNTY

236.    Mr. Quintero alleges the statements contained in paragraphs 1-108 of this Complaint.

237.    This action is brought by Mr. Quintero pursuant to Title 42, Section 1983, United States Code, for the deprivation of its Civil Rights by the Miami-Dade County, Florida and its employees.

238.    Miami-Dade County purports to give its RER Officers *carte blanche* authority to film private property, even when they are in an area where they have no right to be.

239.    Code Enforcement Officers Vincent Carr and Nicole Lopez unlawfully photographed and published images of Mr. Quintero's property without his consent, which constituted a violation of privacy forbidden by the Fourth Amendment.

240.    Mr. Quintero has demonstrated: (a) a substantial likelihood of success on the merits; (b) that irreparable injury will be suffered if the relief is not granted; (c) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (d) that the entry of relief would serve the public interest.

241.    Accordingly, Mr. Quintero respectfully requests that this Honorable Court enter an Order precluding Miami-Dade County officers, officials, and agents from photographing and publishing images of citizens' property without their consent during regulatory checks.

WHEREFORE, Plaintiff, Miguel Quintero, demands judgment for his damages, declaratory and injunctive relief, attorney's fees, the costs of prosecuting this action, and any other relief this Court deems proper and just.

**DEMAND FOR JURY TRIAL**

Mr. Quintero demands a jury trial of all issues so triable as of right by a jury.

DATED: March 11, 2024.

Respectfully submitted,

Hilton Napoleon, II, Esq., FBN 17593
237 South Dixie Hwy., 4th Floor
Coral Gables, Florida 33133
Telephone: 305-510-7106
hilton@napoleonfirm.com
hiltonnapoleoniipa@gmail.com

*Counsel for the Plaintiff, Miguel Quintero*

By: */s/ Hilton Napoleon, II*
Hilton Napoleon, II